FILED
2007 Mar-06  AM 11:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CHRISTI HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Civil Action No. 05-S-1585-NE** |
| **HONDA MANUFACTURING** | ) | |
| **OF ALABAMA, LLC, and TRI** | ) | |
| **STAFFING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This employment discrimination action is before the court on motions for summary judgment filed by defendants TRI Staffing, Inc., and Honda Manufacturing of Alabama, LLC.[1]  For the reasons stated below, both motions are due to be granted.

### PART ONE

### *Summary Judgment Standards*

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[1] Doc. no. 23 (TRI Staffing's Motion for Summary Judgment); doc. no. 26 (Honda Manufacturing of Alabama's Motion for Summary Judgment).

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*

*Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-

moving party are not unqualified, however. "[A]n inference is not reasonable if it is

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case. The relevant rules of substantive law dictate the
> materiality of a disputed fact. A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921). *See also Anderson v.*

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

PART TWO

*Summary of Relevant Facts*

The allegations of discrimination in this case are fairly straightforward. The working relationship of the two defendants, however, is more complicated. Honda Manufacturing of Alabama, LLC ("HMA") operates a motor vehicle manufacturing and assembly facility in Lincoln, Alabama.[2] HMA staffs its plant with approximately forty-three hundred of its own employees,[3] but also contracts with an employment agency known as TRI Staffing, Inc. ("TRI") for temporary workers in the areas of "manufacturing support" and "clerical support."[4]

Under the terms of the HMA / TRI contract, when a need is identified by HMA, TRI must "select and furnish to HMA, employees of [TRI] . . . who are qualified by experience, training or education to perform the work or support services specifically

---

[2] Doc. no. 28 (HMA's Evidentiary Submission), Ex. A (Affidavit of Lynn Johnson), ¶ 2; *id.* at Ex. C (Deposition of Lynn Johnson), p. 12, lines 14-16.

[3] Doc. no. 27 (HMA's Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶ 1.

[4] *Id.* at ¶¶ 9-11. *See also* doc. no. 24 (TRI's Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶ 1.

requested by HMA."[5]  The contract further provides that "all persons assigned to HMA by [TRI] shall be employees of [TRI], in all respects[.]"[6]  In keeping with this arrangement, TRI bears "full responsibility for payment of wages and benefits to its employees temporarily assigned to HMA,"[7] and "HMA [has] no authority to discharge, promote, suspend or otherwise discipline any [TRI] [e]mployee."[8]  HMA actually requires that TRI place on-site supervisors at the plant to oversee the work done by the temporary associates, and to discipline them if the need arises.[9]  HMA also requires that all TRI employees who seek plant placement complete an "Extended Application Process," including a medical screening.[10]

The "Extended Application Process" is an approximately four-hour program that was jointly created by HMA and TRI.[11]  It is held at the Tyler Regional Medical

---

[5] Doc. no. 28, Ex. C, Appended Ex. 2 (Temporary Personnel Services Agreement), p. 1.  As this provision implies, it is HMA that determines the specific position to be filled.  *See* doc. no. 24, Statement of Undisputed Facts, ¶ 20 ("When TRI provided temporary employees to HMA, TRI would not know which specific jobs the temporary employees were to perform[.]").  TRI has merely a general sense of the type of work involved when it selects assignees.  *Id.*

[6] Doc. no. 28, Ex. C, Appended Ex. 2, p. 2.

[7] *Id.* at p. 7.

[8] *Id.* at p. 2.  *See also id.* at Ex. D (Deposition of Gloria Keel), p. 41, lines 1-4.

[9] Doc. no. 27, Statement of Undisputed Facts, ¶¶ 14-15.

[10] *Id.* at ¶¶ 24-25; doc. no. 24, Statement of Undisputed Facts, ¶¶ 13, 22; doc. no. 29 (Plaintiff's Brief in Opposition to TRI's Motion for Summary Judgment), Statement of Undisputed Facts, ¶ 15; doc. no. 30 (Plaintiff's Brief in Opposition to HMA's Motion for Summary Judgment), Statement of Undisputed Facts, ¶ 11.  *See also, e.g.,* doc. no. 28, Ex. D, p. 29, lines 1-4; *id.* at p. 36, line 21 - p. 37, line 8.

[11] Doc. no. 27, Statement of Undisputed Facts, ¶¶ 25, 27.

Center in Anniston; it functions to give the prospective temporary associate a feel for the kind of work that HMA demands, and also to orient the associate to the environment, tasks, and work rules at the production facility.[12]   Although the "Extended Application Process" is conducted by TRI employees, with only rare visits by HMA personnel, HMA trained the TRI employees in how to administer the program.[13]   Assuming the applicant demonstrates proficiency during the orientation portion of the "Extended Application Process," the only impediment to an assignment at HMA is successful completion of the physical examination by a doctor by the name of Varsack at Tyler Regional Medical Center.[14]

TRI's Director of Safety, Health, and Risk Management, Gloria Keel, testified that the point of the medical screening is "primarily to ensure that the associates we sen[d] to Honda [are] able to physically, emotionally, and psychologically perform the tasks of the job."[15]   To that end, "Honda arranged for [Keel] to bring Dr. Varsack and his staff on-site [at the HMA facility] to give them a personal tour and to discuss

---

[12] Doc. no. 28, Ex. E (Deposition of Mary Jane Kiker), p. 24, line 12 - p. 25, line 10.

[13] *Id*. at Ex. D, p. 38, line 23 - p. 39, line 17; *id*. at Ex. E, p. 35, line 19 - p. 36, line 1.

[14] *Id*. at Ex. E, p. 25, lines 11-20; doc. no. 27, Statement of Undisputed Facts, ¶ 29.  The parties have not informed the court of Dr. Varsack's first name.

[15] Doc. no. 28, Ex. D, p. 30, line 21 - p. 31, line 1.  Incidentally, HMA's Rule 30(b)(6) representative — Lynn Johnson — testified that when HMA hires through channels *other than* TRI, it rejects all applicants with medical restrictions except those pertaining to vision.  *Id*. at Ex. C, p. 62, lines 12-23; *id*. at p. 63, line 20 - p. 64, line 6; *id*. at p. 91, lines 1-18.

the jobs [to be performed by temporary associates from TRI]."[16]  If an applicant for assignment to HMA makes it as far as the physical examination, it is up to Dr. Varsack to determine, based on criteria that have not been produced to the court, whether that individual is medically qualified for placement at the plant.[17]  Apparently regardless of Dr. Varsack's decision,

> TRI does not consult with the [HMA] staffing team prior to placing temporary associates at HMA as to whether that temporary associate has work restrictions and/or a disability.  HMA first learns of the identity of the individuals assigned as temporary associates by TRI when they report to the plant for work.[18]

The plaintiff in this case, Christi Harris, neither saw Dr. Varsack nor reported to duty at HMA.  Harris is a twenty-nine year old woman who was diagnosed with cerebral palsy affecting her right hand when she was a child.[19]  Harris's condition, however, is not visibly apparent,[20] and she is able to perform almost all major life functions (*i.e.*, everything short of threading a needle using her right hand) without limitation.[21]  She does not receive treatment for cerebral palsy, and has held several

---

[16] *Id*. at Ex. D, p. 32, lines 7-9.

[17] Doc. no. 24, Statement of Undisputed Facts, ¶¶ 21-22.  *See also* doc. no. 28, Ex. D, p. 65, lines 4-12; *id*. at Ex. E, p. 28, lines 3-11; doc. no. 25 (TRI's Evidentiary Submission in Support of Summary Judgment), Ex. A (Deposition of James Stanford Nolen), p. 26, lines 14-17.

[18] Doc. no. 28, Ex. A, ¶ 8.  *See also* doc. no. 27, Statement of Undisputed Facts, ¶ 32.

[19] Doc. no. 28, Ex. B (Deposition of Christi Harris), p. 11, lines 14-18; doc. no. 27, Statement of Undisputed Facts, ¶ 66.

[20] Doc. no. 27, Statement of Undisputed Facts, ¶ 78.

[21] *Id*. at ¶¶ 68, 71-77.

jobs that necessitate use of the hands without requesting any accommodation.[22]

Harris applied to TRI on January 19, 2005, at its Anniston, Alabama office.[23] On her "pre-application form,"[24] Harris indicated that she was only interested in assignment at HMA, and not with any of TRI's other clients.[25]   TRI Operations Manager Helen Hancock was present at the time, and spoke with Harris about her application.[26]   After Harris left, Hancock performed the standard review of the application and a background check, and then called Harris and invited her to come back to the TRI office and continue the application process.[27]   Harris returned the following Monday, January 24, 2005.[28]   That day, Harris completed an "essential job function" document,[29] and she indicated thereon that she had suffered from "hand

---

[22] *Id.* at ¶¶ 66-70; doc. no. 29, Statement of Undisputed Facts, ¶ 1.

[23] Doc. no. 27, Statement of Undisputed Facts, ¶ 33; doc. no. 29, Statement of Undisputed Facts, ¶ 3; doc. no. 28, Ex. D, p. 47, line 22 - p. 48, line 1.

[24] Completion of the "pre-application form" is the first step for all TRI applicants.   Doc. no. 27, Statement of Undisputed Facts, ¶¶ 20, 23; doc. no. 28, Ex. D, p. 19, line 13 - p. 20, line 19. *See also* doc. no. 28, Ex. E, p. 21, lines 11-18.

[25] Doc. no. 28, Ex. B, Appended Ex. 2 (Pre-Application Form).   *See also* doc. no. 27, Statement of Undisputed Facts, ¶ 34; doc. no. 29, Statement of Undisputed Facts, ¶ 5; doc. no. 24, Statement of Undisputed Facts, ¶ 8.

[26] Doc. no. 27, Statement of Undisputed Facts, ¶ 36; doc. no. 29, Statement of Undisputed Facts, ¶¶ 4-5.

[27] Doc. no. 28, Ex. F (Deposition of Helen Hancock), p. 16, lines 8-11; *id.* at Ex. B, p. 45, line 21 - p. 46, line 14.

[28] *Id.* at Ex. B, p. 46, lines 18-23.

[29] The "essential job function" document is a medical questionnaire.   Doc. no. 27, Statement of Undisputed Facts, ¶¶ 23-24.   One TRI employee who is intimately involved with the medical screening process testified that "[t]he main reason for this form was to try to place the individual in a job that they could successfully do.   It would help [TRI's] staffing specialist assess health problems

problems" in the past, had "bone joint or other deformity," and also that she had received "disability or compensation for any medical conditions."[30]

Upon inventorying Harris's answers to the questions on this form, Hancock inquired as to her hand problems and deformity.[31]   Harris then detailed her cerebral palsy, but evidently was very careful to state that it did not affect her ability to work whatsoever.[32]   Hancock responded that "she didn't know if [Harris] would be able to do the job or not[,] [and that] [s]he would have to call her supervisor."[33]   Hancock's concern was that "the Honda positions were industrial production jobs,"[34] meaning Harris "would be using both of [her] hands."[35]   The two apparently decided that it

---

that might interfere with [the applicant] doing their job[.]"  Doc. no. 28, Ex. D, p. 35, lines 2-9.  An ex-TRI employee added that certain medical conditions, if disclosed on the form or discovered during a subsequent physical evaluation, would require supervisor involvement, and could actually render an applicant ineligible for assignment to HMA under TRI's *de facto* policies.  *See id*. at Ex. G (Deposition of Karen Denise Watts), p. 18, line 22 - p. 20, line 5 (discussing a specific example involving an applicant who was disqualified after it was discovered that he had previously undergone surgery on his pinkie finger).  Yet another ex-TRI employee testified that "any medical problems" disclosed on the "essential job function" form, including specifically carpal tunnel syndrome or back problems, would result in non-referral to HMA.  *Id*. at Ex. H (Deposition of Yolanda Renee Rice), p. 29, line 12 - p. 30, line 15; *id*. at p. 46, line 16 - p. 49, line 8.

[30] Doc. no. 28, Ex. B, Appended Ex. 3 ("Essential Job Function" Form).  Harris had received payments through the Social Security / Disability system, but she claimed she could not recall the basis for the payments or the reason for termination.  *Id*. at Ex. B, p. 37, line 4 - p. 40, line 17.

[31] *Id*. at Ex. B, p. 52, lines 2-4.

[32] Doc. no. 29, Statement of Undisputed Facts, ¶ 6.  *See also* doc. no. 27, Statement of Undisputed Facts, ¶ 41.

[33] Doc. no. 28, Ex. B, p. 52, lines 15-21.  *See also* doc. no. 29, Statement of Undisputed Facts, ¶ 7; doc. no. 30, Statement of Undisputed Facts, ¶ 3.

[34] Doc. no. 28, Ex. F, p. 19, lines 2-4.

[35] *Id*. at Ex. B, p. 53, lines 3-7.

-8-

would be best for Harris to leave, allowing Hancock to consult other TRI employees about how the process should proceed from there.[36]

Hancock then contacted Keel, TRI's Risk Manager, who took the matter up with TRI's Chairman and Owner, James Nolen.[37]  Nolen decided that it would be prudent to have Harris obtain a release from her doctor stating that she was capable of performing an industrial-type assignment, and that decision was then communicated to Hancock *via* Keel.[38]  Hancock, in turn, told Harris that she could participate in the next step of the hiring process if she would get a release from her physician indicating that she could do the work.[39]  Harris obtained a statement from her physician, Dr. Michael Herndon, but it was not really a "release" in the sense that TRI probably envisioned — that is, Dr. Herndon did not sign a document approving Harris for all industrial-level work.[40]  Rather, Dr. Herndon wrote that:

> [Harris] has congenital deformity of [right] hand which limits fine motor movement of [right] hand only.  Has good strength of [right upper extremity and] able to lift.  Only work restriction is inability of [*sic*] fine motor movement [in right] hand.[41]

---

[36] *Id*. at lines 8-14.

[37] Doc. no. 25, Ex. A, p. 14, lines 3-7.

[38] *Id*. at lines 8-12; doc. no. 28, Ex. F, p. 19, lines 9-14.

[39] Doc. no. 28, Ex. B, p. 53, lines 15-23; *id*. at Ex. F, p. 19, lines 9-15.

[40] *Id*. at Ex. B, p. 32, lines 9-15.  *See also* doc. no. 27, Statement of Undisputed Facts, ¶ 45.

[41] Doc. no. 28, Ex. B, Appended Ex. 1 (Statement of Dr. Herndon).  *See also* doc. no. 27, Statement of Undisputed Facts, ¶ 49.

After reading the statement, Hancock decided that it would not be sufficient, and told Harris over the telephone that the restriction disqualified her from assignment at HMA.[42]  Harris took umbrage, and explained that she did not feel that conclusion was justified, prompting Hancock to state that she would call her back later.[43]  When Hancock returned the call, she changed her tune, stating that Harris could attend the "Extended Application Process" if she passed a drug test.[44]  Harris passed the drug screen, and that apparently ended her interaction with Hancock.[45]

Several days later, Harris reported to the Tyler Center in Anniston to attend the "Extended Application Process."[46]  Representing TRI at the Tyler Center were Risk Manager Gloria Keel and Regional Manager Mary Jane Kiker.[47]  The first order of business for Keel was examining each applicant's paperwork, which she was doing in a crowded snack room.[48]  When it became time to discuss Harris's application,

---

[42] Doc. no. 29, Statement of Undisputed Facts, ¶ 9.  *See also* doc. no. 28, Ex. B, p. 55, lines 14-19.  The basis for Hancock's stance is not clear since all TRI representatives repeatedly stated that HMA had not provided any listing of disqualifications for temporary assignees.  *See*, *e.g.*, *id.* at Ex. F, p. 22, lines 1-5.  On the other hand, there is testimony from HMA's Rule 30(b)(6) representative that fine motor skills are needed for some positions at HMA.  *See* doc. no. 28, Ex. C, p. 32, line 12 - p. 33, line 12.

[43] Doc. no. 28, Ex. B, p. 55, lines 19-22.

[44] Doc. no. 29, Statement of Undisputed Facts, ¶ 10; doc. no. 28, Ex. B, p. 56, lines 3-12.

[45] Doc. no. 28, Ex. B, p. 56, lines 13-20; *id.* at Ex. F, p. 21, lines 1-6.

[46] *Id.* at Ex. B, p. 58, lines 1-9.

[47] *Id.* at Ex. E, p. 29, lines 6-21; *id.* at Ex. D, p. 56, line 14 - p. 57, line 4.

[48] *Id.* at Ex. D, p. 57, lines 1-4.

however, Keel "asked her to step outside . . . into the hallway [along with Kiker and Keel] to afford her some privacy."[49]  Harris did so, but what happened from that point is contested.

Harris's account — which must be credited for summary judgment purposes — is that Keel essentially told her that due to Dr. Herndon's restrictions upon her fine motor movements with her right hand, she could not (and would not be allowed to) do "the job" at HMA.[50]  Harris described the exchange as follows:

> She told me that the job would . . . [require use of] both of my hands, and I told her that I could use both of my hands and arms, that Dr. Herndon specifically said it was fine motor movements that I could not do with my right fingers, but I could do them with my left.  She told me that was not acceptable, it was right hand only.[51]

Keel admits that she had concerns about Harris's ability to perform the HMA assignment, and also that she broached the issue of fine motor movements, but contends that she simply described the work and asked Harris whether she thought

---

[49] *Id.* at lines 8-14.  *See also id.* at Ex. B, p. 58, lines 16-18 ("She [Keel] looked at my paperwork, and she looked back up, and she called the other lady [Kiker] and said, don't we need to speak with her outside?").

[50] *Id.* at Ex. B, p. 58, lines 18-20.  It is somewhat imprecise to refer to an assignment that potentially entails varied work in myriad different departments of the HMA facility as *a* "job."  First, it implies that the position is somewhat singular in its functions; second, it implies that an applicant is aware of the precise position they will staff.  In actuality, the testimony here indicates that Harris understood she was applying for an *assignment* in the "parts assembly" portion of the HMA plant.  Doc. no. 27, Statement of Undisputed Facts, ¶ 35.  No party has further clarified whether this is a relatively narrow division with few employees, or a large portion of the plant that includes a broad category of jobs, and Harris apparently did not know either at the time she applied.

[51] Doc. no. 28. Ex. B, p. 59, line 21 - p. 60, line 4.

she could handle it.[52]  In any case, it is undisputed that Harris answered that she believed she could handle the HMA assignment.[53]

Keel and Kiker say they told Harris that if she thought she could perform the work, she could stay and attempt to make it through the "Extended Application Process."[54]  According to their version of events, however, Harris became angry and refused to attend the program, choosing instead to forego the opportunity they had provided.[55]  Harris's version — and, again, the one the court must rely upon for present purposes — is that she "wasn't allowed" to attend the "Extended Application Process."[56]  The end result is that Harris left without having attended the program or discussing any alternative placements or other accommodations.[57]  HMA was not made aware of Harris's application, nor was it informed of the fact that she did not participate in the "Extended Application Process."[58]

Harris filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in February 2005, and followed up by filing this lawsuit

---

[52] *Id*. at Ex. D, p. 57, lines 19-22.

[53] *Id*. at p. 58, lines 8-10; *id*. at p. 65, line 13 - p. 67, line 1.

[54] *Id*. at p. 58, lines 8-15; *id*. at Ex. F, p. 30, lines 12-16.  *See also* doc. no. 27, Statement of Undisputed Facts, ¶ 56

[55] *E.g.*, doc. no. 28, Ex. D, p. 58, lines 12-15.

[56] *Id*. at Ex. B, p. 61, lines 14-16.

[57] *Id*. at line 22 - p. 62, line 9.

[58] Doc. no. 27, Statement of Undisputed Facts, ¶¶ 61, 63.

against HMA and TRI on July 27 of the same year.[59]  In her complaint, she asserted

claims under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

*et seq*., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  The

court has since granted Harris's motion to voluntarily dismiss her Title VII claim,

which was based on a theory of gender discrimination.[60]  Harris's ADA claim is

predicated upon a theory that HMA and TRI refused to hire her "due to her cerebral

palsy and/or because they regarded her as being disabled."[61]  Significantly, Harris has

abandoned any allegation of discrimination as a result of an actual disability, arguing

instead that her case is based solely on the claim that TRI discriminated against her

because it *regarded her* as being disabled.  She also claims that HMA and TRI "have

a pattern and practice of discriminating against other individuals who are disabled

and/or are regarded as being disabled,"[62] but admits that no such allegation was

included in her EEOC charge.[63]  Central to both variations of her ADA claim is the

allegation that HMA and TRI constitute "joint employers" under the anti-

discrimination statutes.[64]

---

[59] *See* doc. no. 1 (Complaint); *id*. at Ex. 1 (EEOC Charge).

[60] *See* Order Dated September 7, 2006.

[61] Doc. no. 1, ¶ 45.

[62] *Id*. at ¶ 46.

[63] Doc. no. 27, Statement of Undisputed Facts, ¶ 89(a).

[64] Doc. no. 1, ¶ 12.  There is apparently no dispute that TRI was Harris's prospective employer — the debate centers on whether HMA *also* would have been her employer.

PART THREE

*Overview of the ADA*

The ADA was enacted by Congress in 1990 for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).[65] To achieve such purposes, among others, the ADA provides that no covered entity,[66] including private employers,[67]

> shall discriminate against *a qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

---

[65] When considering the need for the legislation, Congress observed that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination . . . continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Discrimination was found to persist in "critical areas" of everyday life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* at § 12101(a)(3). Congress further found that discrimination against persons with disabilities took many forms, ranging from "outright intentional exclusion," to "failure to make modifications to existing facilities and practices." *Id.* at § 12101(a)(5). Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled persons, and to integrate them "into the economic and social mainstream of American life." S. Rep. No. 101-116, p. 20 (1989); H.R. Rep. No. 101-485, pt. 2, p. 50 (1990); *U.S. Code Cong. & Admin. News* 1990, pt. 2, pp. 303, 332.

[66] "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2).

[67] "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person. . . ." 42 U.S.C. § 12111(5)(A).

*Id.* at § 12112(a) (emphasis supplied).

To state a claim under the ADA, then, Harris must demonstrate that: (1) she has a "disability" within the meaning of the ADA; (2) she is otherwise "a qualified individual"; and (3) she suffered an adverse employment action — *i.e.*, was discriminated against — because of her disability. *See*, *e.g.*, *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Company*, 206 F.3d 1055, 1061 (11th Cir. 2000). *See also Brandon v. Lockheed Martin Aeronautical Systems*, 393 F. Supp. 2d 1341, 1345 (N.D. Ga. 2005).[68]

## PART FOUR

### *Analysis*

In moving for summary judgment, HMA and TRI assert that Harris cannot establish certain of the above-mentioned elements, either through direct or circumstantial evidence, and therefore cannot state a *prima facie* case of disability discrimination. In an ADA case, "regardless of the operating analytical framework, the court must first determine (1) whether plaintiff is disabled and (2) whether he can,

---

[68] Additionally, Harris must show that the decision-maker had actual knowledge of her disability at the time of the adverse employment action. *E.g.*, *Cordoba v. Dillards, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005) (noting that "a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability").

with or without reasonable accommodation, perform the essential functions of his job." *Wicks v. Riley County Board of County Commissioners*, 125 F. Supp. 2d 1282, 1289 (D. Kan. 2000) (footnote omitted). Because Harris has failed to establish that she is "disabled" within the meaning of the ADA, the court agrees that the *prima facie* case is lacking.

Harris admits repeatedly that she is not truly hindered by her cerebral palsy and, therefore, it might at first appear that she could not possibly fall within the protective scope of the ADA. This, however, is not the reason her claim fails. The ADA defines "disability" in three ways — that is, as including any person: who has a "physical or mental impairment" that "substantially limits" one or more of the "major life activities" of such person; or who has "a record of such an impairment"; or who is "*regarded as* having such an impairment." *Id.* at § 12102(2)(A) – (C) (emphasis supplied). *See also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he [or she] satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates*, *Inc*., 100 F.3d 907, 911 (11th Cir. 1996).

Harris alleges that she is "disabled" solely because she was "regarded as" having a substantially limiting impairment by the decision-makers at TRI.[69] *See* 42

---

[69] Doc. no. 29, pp. 9-10.

U.S.C. § 12102(2)(C).   The Supreme Court has explained the workings of the

"regarded as" definition of "disability" in § 12102(2)(C) as follows:

> There are two apparent ways in which individuals may fall within this
> statutory definition:   (1) a covered entity mistakenly believes that a
> person has a physical impairment that substantially limits one or more
> major life activities, or (2) *a covered entity mistakenly believes that an
> actual*, *nonlimiting impairment substantially limits one or more major
> life activities*.   In both cases, it is necessary that a covered entity
> entertain misperceptions about the individual — it must believe either
> that one has a substantially limiting impairment that one does not have
> or that one has a substantially limiting impairment when, in fact, the
> impairment is not so limiting.  These misperceptions often "resul[t] from
> stereotypic assumptions not truly indicative of . . . individual ability."
> *See* 42 U.S.C. § 12102(7).

*Sutton v. United Air Lines*, *Inc*., 527 U.S. 471, 489 (1999) (emphasis supplied, other

alterations in original).  *See also* 29 C.F.R. § 1630.2(*l*) (defining "regarded as having

such an impairment").[70]

As a general rule, "[t]he ADA requires that the impairment substantially limit

one or more of the individual's major life activities."  *Gordon*, 100 F.3d at 911.  This

requirement is equally applicable when the allegation is that the individual's

impairment is not in fact substantially limiting, but the decision-maker regarded it as

such.  *Id*. at 913 (noting that, "[a]s with real impairments, courts have held that a

---

[70] "These provisions and regulations are intended to combat the effects of archaic attitudes,
erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded
as having, disabilities."  *Gordon*, 100 F.3d at 913.

perceived impairment must be substantially limiting and significant"). In this situation, the somewhat esoteric question is whether the impairment, *as perceived*, is one that would substantially limit a major life activity. *See Carruthers*, 357 F.3d at 1216 ("Under the 'regarded as' prong, a person is 'disabled' if her employer perceives her as having an ADA-qualifying disability, *even if there is no factual basis for that perception*.") (emphasis supplied). Further complicating matters is the fact that the ADA does not define those conditions constituting a "physical or mental impairment," nor those endeavors qualifying as "major life activities." Instead, these phrases, and many other significant terms in the Act, are only defined in regulations promulgated by the EEOC pursuant to authority delegated by Congress. *See* 42 U.S.C. § 12116. Such regulations do not bind this court, but they may be relied upon "for guidance." *Gordon*, 100 F.3d at 911.

The EEOC's administrative interpretations of the ADA define the phrase "physical or mental impairment" as meaning, *inter alia* —

> [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine . . . .

29 C.F.R. § 1630.2(h). "Major life activities" are defined by another regulation as including "functions such as caring for oneself, performing manual tasks, walking,

-18-

seeing, hearing, speaking, breathing, learning, and working." *Id*. at § 1630.2(i). Harris contends that she was perceived as (and in fact is) suffering from the neurological and musculoskeletal impairment of cerebral palsy, and that the decision-makers felt her condition substantially limited her in the major life activity of "working."[71]   *See*, *e.g.*, *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) (accepting the argument that "working" is a major life activity).

There can be little doubt that Harris has sufficient evidence to create a jury question on the issue of whether the alleged decision-maker in this case — Keel, and possibly even Kiker — regarded her as suffering from an "impairment."   TRI does not dispute that it knew about Harris's condition; indeed, it was concerned enough about it to require her to obtain a physician's release before even permitting her application to move forward.[72]   Furthermore, Keel openly admits that she was aware of Harris's cerebral palsy, and also that, after reading Harris's doctor's statement, she had some doubts about her ability to do the work required at the HMA facility because it was "very repetitive, hand-intensive."[73]   Accordingly, the question becomes whether the impairment, as Keel perceived it, is one that would "substantially limit" Harris in the major life activity of "working."   *See*, *e.g.*, *Hilburn v. Murata Electronics North*

---

[71] Doc. no. 29, p. 10.

[72] *E.g.*, doc. no. 24, Statement of Undisputed Facts, ¶ 12.

[73] *E.g.*, doc. no. 28, Ex. D, p. 57, lines 19-22.

*America*, *Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) (noting that "a physical impairment alone is not necessarily a disability under the ADA").

To regard Harris as substantially limited in that activity, TRI must have perceived her impairment to be one that renders her "'significantly restricted in the ability to perform either a *class of jobs* or a *broad range of jobs in various classes* as compared to the average person having comparable training, skills, and abilities.'" *Carruthers*, 357 F.3d at 1216 (emphasis supplied) (quoting with approval 29 C.F.R. § 1630.2(j)(3)(i)). *See also Hilburn*, 181 F.3d at 1227. "Thus, an impairment must preclude — or at least be perceived to preclude — an individual from more than one type of job, even if the job foreclosed is the individual's job of choice." *Carruthers*, 357 F.3d at 1216. *See also Gordon*, 100 F.3d at 913 ("In this context, then, a significant impairment is one that is viewed by the employer as generally foreclosing *the type of employment involved*, *not just a narrow range of job tasks*.") (emphasis supplied). Additionally, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). *See also Pritchard v. Southern Company Services*, 92 F.3d 1130, 1133 (11th Cir. 1996) (noting that it is not enough to show that a real or perceived impairment precludes performance of "a particular specialized job or a narrow range of jobs") (internal quotations and citations omitted); *EEOC v. Joslyn Manufacturing*

-20-

*Company*, No. 95-C-4956, 1996 WL 400037, at * 6 (July 15, 1996) ("[T]he proper test is whether the impairment, as perceived, would affect the individual's ability to find work across a class of jobs or broad range of jobs in various classes.").

Harris contends only that she was perceived as limited in a "class of jobs."[74] The class she identifies, however, is somewhat unorthodox: *i.e.*, "any of the assignments at Honda."[75] This is odd because, generally, "[a] class of jobs consists of jobs in the geographic area in which the plaintiff resides that utilize 'similar training, knowledge, skills or abilities.'" *Witter v. Delta Air Lines*, *Inc.*, 130 F.3d 1366, 1370 (11th Cir. 1998) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)).[76] Harris has

---

[74] Doc. no. 29, p. 11.

[75] *Id.*

[76] The EEOC regulations explicate the difference between a "class of jobs" and a "broad range of jobs in various classes." The EEOC recommends that courts rely upon the following considerations in determining whether an individual is substantially limited in a "class of jobs":

> The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.

29 C.F.R. § 1630.2(j)(3)(ii)(B). With respect to a "broad range of jobs in various classes," the EEOC suggests that the court consider:

> The job from which the individual has been disqualified because of an impairment, and the number and types of *other jobs not* utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.

*Id.* at § 1630.2(j)(3)(ii)(C) (emphasis supplied).

-21-

not produced — and the court has not been able to locate — any controlling authority holding that a grouping of positions offered by a single employer can constitute a "class of jobs." In any event, the nature of the "class of jobs" inquiry strongly belies such a conclusion. On the other hand, the Eleventh Circuit has squarely held that "*manufacturing* is a class of jobs or broad range of jobs for disability purposes." *Rigby v. Springs Industries*, *Inc.*, 156 Fed. Appx. 130, 132 (11th Cir. 2005) (emphasis supplied). The court will therefore assume that Harris alleges perceived disqualification from the class of "manufacturing jobs." With the proper frame of reference in mind, it is nevertheless clear that Harris has failed to produce sufficient evidence to show that she was regarded as substantially limited in this class.

At her deposition, Harris testified in detail to the exchange between herself and Keel at the Tyler Center, where she alleges she was barred from completing the application process. The conversation took place shortly after Keel had read Dr. Herndon's written restrictions on what Harris could do in the workplace; as stated above, Dr. Herndon essentially stated that Harris was limited only in her ability to perform fine motor movements with her right hand. Harris testified that it was this restriction that Keel cited in telling her she could not perform the HMA assignment.[77] During the course of the conversation, Harris recalls two problems identified by Keel

---

[77] Doc. no. 28, Ex. B, p. 58, lines 18-20.

that would flow from the restriction:   first, Keel told Harris that the assignment required use of both hands;[78] second, she stated that performing fine motor skills with the left hand would not suffice — "it was right hand only."[79]

The problem with this is that, when TRI assigns individuals to work at HMA, it "[does] not know the specific jobs the temporary employees [are] to perform (other than, for example, 'auto assembly jobs')"; nor are applicants guaranteed any specific position at HMA.[80]  Perhaps for this reason, all assignees must be willing and able to work in *any* department at HMA, and to learn and perform *any* position at the facility[81] — *some* of which allegedly require fine motor skills in one or both hands.[82] Therefore, Harris's testimony that Keel regarded her as incapable of completing fine motor movements with her right hand, or any positions that required such movements with both hands, does not indicate that Keel perceived her as unable to perform a broad "class of jobs."  To the contrary, it suggests that Keel regarded her as unable to perform that *narrow group* of manufacturing positions at HMA that called upon

---

[78] *Id.* at Ex. B, p. 59, lines 21-23.  *See also* doc. no. 24, Statement of Undisputed Facts, ¶ 11.

[79] Doc. no. 28, Ex. B, p. 60, lines 3-4, 21-23.

[80] Doc. no. 24, Statement of Undisputed Facts, ¶¶ 19-20.  Harris testified that she understood she was applying for a "parts assembly" position, though she was not sure of what that entailed. Doc. no. 27, Statement of Undisputed Facts, ¶ 35 (citing doc. no. 28, Ex. B, p. 84, lines 3-6).

[81] Doc. no. 24, Statement of Undisputed Facts, ¶¶ 9(e)-(f).  *See also* doc. no. 28, Ex. C, p. 54, lines 2-7.

[82] Doc. no. 28, Ex. C, p. 32, lines 21-23; *id.* at p. 33, lines 5-7.

either of those two distinct skills.

To be sure, there are courts that have been willing to take account of "[c]ommon job groupings within a particular industry" in defining the relevant "class of jobs." *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 673 (7th Cir. 1998) (implying, in *dictum*, that "any assembly line job that required repetitive movement" could constitute a "class of jobs," apparently separate and apart from the class of "assembly line work"). The Supreme Court has suggested, however, that the term should be understood as an expansive categorization, one that includes multiple variations of contextually similar jobs, so that there is no room for excessive subdivision within a given class.[83]

In other words, rather than defining a "class of jobs" with reference to every minute feature of the position at issue — such that almost every job could itself constitute a "class" — the proper approach is to consider all positions within a particular field of work before determining that an individual's impairment (be it real or imagined) renders them substantially limited in their ability to perform work in that field. *See*, *e.g.*, *Sutton*, 527 U.S. at 493 (refusing to hold that the plaintiffs were

---

[83] The EEOC's interpretative guidance is in accord with this instruction. *See*, *e.g.*, EEOC Compliance Manual § 902: 8; 29 C.F.R. § 1630 App. (listing "heavy labor jobs," "jobs that involve manual labor," "semi-skilled jobs," and "jobs requiring use of a computer" as classes of jobs). *See also Phillips v. Wal-Mart Stores*, *Inc.*, 78 F. Supp. 2d 1274, 1285 (S.D. Ala. 1999) (citing EEOC guidance for the proposition that "heavy labor" would be a "class of jobs").

limited in a "class of jobs" because, although their perceived impairments disqualified them from the position of "global airline pilot," they remained qualified for "a number of other positions utilizing [similar] skills, such as regional pilot and pilot instructor to name a few"); *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 524 (1999) (holding that it was not enough for the plaintiff to show "that he is regarded as unable to perform the job of mechanic only when that job requires driving a commercial motor vehicle"; he "put forward no evidence that he is regarded as unable to perform any mechanic job that does not require driving a commercial motor vehicle").

Following this lead, many circuit courts, including the Eleventh Circuit, have defined the phrase "class of jobs" in the broadest possible terms — sometimes such that the term becomes essentially synonymous with the word "industry." *See*, *e.g.*, *D'Angelo v. Con Agra Foods, Inc.*, 422 F.3d 1220, 1228 n.5 (11th Cir. 2005) (characterizing a plaintiff who was unable to work around moving equipment as possibly limited in "the entire class of factory jobs"); *McKay v. Toyota Manufacturing, U.S.A., Inc.*, 110 F.3d 369, 373 (6th Cir. 1997) ("[W]e hold that the physical restrictions caused by plaintiff's disability do not significantly restrict her ability to perform the class of jobs as issue, manufacturing jobs; at best, her evidence supports a conclusion that her impairment disqualifies her from only the narrow range

-25-

of assembly line manufacturing jobs that require repetitive motion or frequent lifting

of more than ten pounds.").[84]

Of course, given certain facts, Harris might have a viable argument that *most*

or *all* jobs within the general class of manufacturing jobs require the two skills that

she was allegedly perceived as lacking.  *Cf. D'Angelo*, 422 F.3d at 1228 n.5.  But

Harris has failed to produce any evidence even that a substantial number of the jobs

*at HMA* require those two skills.  *See*, *e.g.*, *Quint v. A.E. Staley Manufacturing*

*Company*, 172 F.3d 1, 12 (1st Cir. 1999) (noting that EEOC regulations "require the

presentation of evidence of general employment demographics and/or of recognized

occupational classifications that indicate the approximate number of jobs (*e.g.*, 'few,'

'many,' 'most') from which an individual would be excluded because of an

impairment") (internal quotations and citation omitted).  Because Keel was not in a

---

[84] *See also EEOC v. Heartway Corporation*, 466 F.3d 1156, 1163 n.6 (10th Cir. 2006) (noting that "although 'police officer' is not a class of jobs, 'law enforcement positions' may constitute such a class") (internal citations omitted); *Witter*, 130 F.3d at 1370 (holding, pre-*Sutton*, that "piloting airplanes is too narrow a range of jobs to constitute a 'class of jobs,'" and ruling against the plaintiff because he failed to produce any evidence that he was "regarded as unable to perform, not just the job of being a pilot, but also the non-piloting jobs [outlined in the opinion]");; *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir. 1995) (holding that there was no evidence that plaintiff was limited in a "class of jobs" because "her injured arm adversely affects only the functioning in a welding position requiring substantial climbing," and evidently did not preclude her from working as a non-climbing welder); *Dunn v. Lear Seating Corporation*, No. 3:00CV518H, 2001 WL 1685486, at * 3 (W.D. Ky. Sept. 19, 2001) ("Plaintiff has offered no evidence that her disability, as perceived by Defendant, prevents her from obtaining work which is not in the narrow range of repetitive-motion assembly jobs."); *Wicks*, 125 F. Supp. 2d at 1293-94 ("Plaintiff's impairment appears, at best, to only restrict him from a narrow range of jobs that require repetitive lifting [of] over forty-five to fifty pounds").

position to evaluate Harris for individual positions at HMA — she had to select applicants who she perceived were capable of performing *any* position HMA elected to place them in — her alleged comments, without more, do not satisfy this requirement.[85]  Moreover, Harris confirmed at her deposition that she had no "idea what people who work on the assembly line at Honda are required to do," nor was she aware of "specifically or even generally what fine motor skills are required of associates at Honda."[86]  HMA Rule 30(b)(6) representative Lynn Johnson shed very little additional light on the subject, stating only that fine motor skills are required in "some areas," and that whether they would be required in both hands "depends on the job," without offering any specifics.[87]

There is, accordingly, insufficient evidence from which a jury could conclude that Harris's perceived limitation precluded her from performing a substantial number of the "jobs" at HMA.  At most, all that could reasonably be inferred from the record is that, due to her perceived limitations, Harris was not eligible for an assignment

---

[85] And, as discussed below, it is not enough to characterize the assignment at HMA as *one* "job" requiring the skills to perform any number of *positions*, and then argue substantial limitation in the entire class of "manufacturing jobs," because there is no evidence in the record that a significant number of such jobs in the same geographic area require this combination of skills. Indeed, the record reveals very little even about the precise skills needed to perform the work at HMA *alone*.  *See* doc. no. 28, Ex. C, pp. 32-33.

[86] *Id*. at Ex. B, p. 84, lines 16-23 (quotations come from attorney's questions, to which Harris responded "no").

[87] *Id*. at Ex. C, p. 32, line 19 - p. 33, line 7.

since at least *some* positions performed by assignees require *some* skills Keel did not believe Harris possessed. *See*, *e.g.*, *Dunaway v. Ford Motor Company*, 134 Fed. Appx. 872, 880 (6th Cir. 2005) ("Dunaway has not presented any evidence of the physical requirements of this class of jobs, which would enable him to show Ford's restrictions would have precluded him from them."); *Wicks*, 125 F. Supp. 2d at 1293 ("Plaintiff fails, however, to present evidence detailing the jobs from which he is actually disqualified."); *Joslyn Manufacturing*, 1996 WL 400037, at * 7 (recognizing as critical plaintiff's evidence that his perceived impairment would preclude performance of at least seven different positions with defendant alone); *cf. Swain v. Hillsborough County School Board*, 146 F.3d 855, 857 (11th Cir. 1998) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").

In addition to showing substantial *internal* disqualification within HMA (which Harris has failed to do), the cases require specific demonstration of widespread *external* disqualification from similar manufacturing jobs within the same geographical area. *See Blundell v. Health Care Authority of the City of Huntsville*, 140 Fed. Appx. 154, 156 (11th Cir. 2005) ("The plaintiff must show not only that her employer perceived her as unable to perform the relevant 'class of jobs,' but that she is also unable to perform *other jobs in the area* that utilized 'similar training,

-28-

knowledge, skills or abilities.'") (emphasis supplied; citation omitted); *Duncan v. Washington Metropolitan Area Transit Authority*, 240 F.3d 1110, 1115-16 (D.C. Cir. 2001) ("[W]e hold that the ADA requires a plaintiff in Duncan's position to produce some evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of such jobs[.]").[88] Harris has produced no evidence whatsoever indicating the impact of a perceived impairment affecting her right hand on her ability to perform manufacturing-class jobs in the same geographical area. Indeed, in opposing summary judgment, Harris did not even include an evidentiary submission, choosing instead to rely upon the evidence submitted by TRI and HMA. Nothing in the evidence offered by the defendants addresses this critical issue — indeed, the parties have barely briefed the subject.

It is a rare case in which a plaintiff claiming a substantial limitation in the major life activity of "working" can proceed to trial without *some* testimony

---

[88] *See also Quint*, 172 F.3d at 11-12 (discussing extensively the importance of showing geographical area job disqualification); *DePaoli*, 140 F.3d at 673 (holding that "in order to define a meaningful class of jobs, we must look to . . . the geographic area reasonably available to the plaintiff"); *Dunn*, 2001 WL 1685486, at * 3 ("The EEOC regulations suggest that at the very least, a plaintiff must present *specific evidence* of the occupational category disqualification within a given geographical area.") (emphasis supplied); *cf. Henderson v. Ardco, Inc.*, 247 F.3d 645, 652 (6th Cir. 2001) (speaking of "the need, when a plaintiff claims an impairment in the major life activity of working, for *particular evidence* on such matters as local economic conditions and the plaintiff's educational background") (emphasis supplied).

(generally, but *not necessarily*, from a vocational expert[89]) discussing the probable impact of the perceived limitation on the plaintiff's ability to obtain work within a particular sector.   *See*, *e.g.*, *Dunaway*, 134 Fed. Appx. at 880 (discussing the plaintiff's failure of proof and noting that he probably could have avoided summary judgment by "present[ing] an expert's testimony as to the percentage of jobs in the broad class of jobs the employer's restrictions would prevent him from performing."). In the present case, Harris has presented neither personal nor expert testimony addressing the impact of her allegedly perceived impairment on her ability to perform jobs in the class of manufacturing, whether at HMA or at other employers in the same general vicinity of her residence.   Harris has not adduced enough evidence to substantiate her claim that she was regarded as substantially limited in a "class of jobs," and therefore does not qualify as "disabled" under the ADA.

While the court is not exactly pleased with the result that flows from this failure of proof — given the seriousness of Harris's allegations and the relative evidentiary strength in other areas of the case — it has little choice but to grant

---

[89] The Eleventh Circuit has held that "expert vocational evidence, although instructive, is not necessary to establish that a person is substantially limited in the major life activity of working." *Mullins v. Crowell*, 228 F.3d 1305, 1314 n.18 (11th Cir. 2000).  This does not mean, of course, that *no* testimony is required.  To the contrary, the panel in *Mullins* instructed that courts "should" require such evidence, but that "a plaintiff could testify from his or her own extensive job search whether other jobs that he or she could perform were available in the geographical area."  *Id*.

summary judgment to the defendants.[90]

## PART FIVE

### Conclusion

For the foregoing reasons, the motions for summary judgment filed by TRI and HMA are due to be granted. An appropriate order will be entered contemporaneously herewith.

DONE this 6th day of March, 2007.

_____

United States District Judge

---

[90] Because Harris's allegations against HMA were essentially dependent upon establishing a *prima facie* case against TRI, the court does not reach the joint employer liability issue. This leaves only the allegation that HMA and TRI have a "pattern and practice" of not hiring individuals with disabilities and/or medical restrictions, which Harris admits was not included in her EEOC charge of discrimination. Doc. no. 27, Statement of Undisputed Facts, ¶ 89(a). According to HMA, that claim should be dismissed "because it exceeds the reasonable scope of [Harris's] EEOC charge, in which no pattern or practice allegation was raised." Doc. no. 28, p. 26. Harris does not respond to this argument in opposing either motion for summary judgment and, in any case, the court agrees with HMA. *See, e.g., Lett v. Reliable Ruskin*, No. 1:05-CV-479-A(WO), 2005 WL 2128041, at * 3 (M.D. Ala. Aug. 29, 2005) (granting defendant summary judgment on a "pattern and practice" claim brought under Title VII and the Age Discrimination in Employment Act because "a pattern and practice claim could not reasonably be expected to arise out of the allegations in the EEOC charge since [the plaintiff] only alleges [the defendant] discriminated against *him*") (emphasis supplied). Similarly, here, Harris's EEOC charge is limited to allegations that *she* was discriminated against. *See* doc. no. 1, Ex. 1 (EEOC Charge). Therefore, the "pattern and practice" claim is not viable. *See generally Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1559-70 (11th Cir. 1987) (discussing "like or related" doctrine in the context of Title VII); *Jones v. United Parcel Service, Inc.*, 411 F. Supp. 2d 1236, 1254 (D. Kan. 2006) (same, in the context of the ADA).